# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Peggy Mae Swanson,                                    Civ. No. 09-1737 (MJD/JJK)

        Plaintiff,

v.

Michael J. Astrue,                          **REPORT AND RECOMMENDATION**
Commissioner of Social
Security,

        Defendant.

Sean M. Quinn, Esq., Falsani, Balmer, Peterson, Quinn & Beyer, counsel for
Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Peggy Swanson seeks judicial

review of the final decision of the Commissioner of Social Security ("the

Commissioner"), who denied Plaintiff's applications for disability-insurance

benefits and supplemental-security income. The parties have filed cross-motions

for summary judgment (Doc. Nos. 6, 10). This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

District of Minnesota Local Rule 72.1. For the reasons stated below, this Court

recommends that Plaintiff's motion be granted in part and denied in part, that

Defendant's motion be denied, and that this case be remanded to the

Commissioner for a calculation and award of a closed period of disability benefits.

## BACKGROUND

### I.    Procedural History

Plaintiff filed applications for disability-insurance benefits and supplemental-security income in June 2006, alleging a disability-onset date of January 7, 2005.  (Tr. 123-31.)[1]  The applications were denied initially and on reconsideration.  (Tr. 74-86, 90-95.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on December 17, 2008.  (Tr. 97-99, 22-73.)  On February 24, 2009, the ALJ issued an unfavorable decision.  (Tr. 8-21.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on June 23, 2009.  (Tr. 1-7.)  The ALJ's decision therefore became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On July 8, 2009, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g).  The parties thereafter filed cross-motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.

---

[1]    Throughout this Report and Recommendation, reference to the administrative transcript for the present case, Civ. No. 09-1737 (MJD/JJK), is made by using the abbreviation "Tr."

## II.    Factual Background and Medical History

Plaintiff was born on November 16, 1954.  (Tr. 123.)  At the time of her alleged onset of disability, she was 50 years old.  (Tr. 19.)  Plaintiff is a high-school graduate and has an additional year of vocational training.  (Tr. 157.) Plaintiff has past relevant work as a medical secretary, data-entry operator, collections clerk, and telemarketer at a sedentary, semi-skilled level, and a health-unit clerk at a light, semi-skilled level.  (Tr. 213.)  Plaintiff stated she was fired from two different jobs in 2004-2005 for missing too much work.  (Tr. 151.) Plaintiff alleged that the following conditions limit her ability to work:  depression, diabetes, back, neck and shoulder pain, anxiety, fatigue, neuropathy in both feet, heart palpitations, chest pain, hypercholesterolemia, hypertension, bilateral trigger fingers, post carpal tunnel surgery, GE reflux, alcohol abuse, rosacia, obesity, hormonal therapy, and fibroids.  (*Id.*)

In this case, Plaintiff does not challenge the ALJ's physical residual-functional-capacity determination, she challenges only the ALJ's mental residual-functional-capacity determination.  Plaintiff explained that she does not feel dependable for work from day to day, and that on some days she is unable to leave the house.  (*Id.*)  She also explained that she can not function at home, does not clean her house, is ashamed to let people in her home, and is tired all the time from diabetes and depression.  (*Id.*)

Before Plaintiff's alleged onset date in January 2005, Plaintiff missed a lot of work in 2004.  On March 12, 2004, Plaintiff saw Dr. Ken Howard at Duluth

Internal Medicine Associates, St. Luke's for an annual exam. (Tr. 614-15.)[2] She reported missing a lot of work in February due to depression. (Tr. 614.) Plaintiff was taking Prozac and Amitriptyline, but reported they did not seem to help her depression. (*Id.*) Dr. Howard discontinued Prozac, started Paxil, and referred Plaintiff to St. Luke's Hillside Center Psychology for counseling. (Tr. 615.)

In March and April 2004, Plaintiff continued to miss work due to depression. (Tr. 605-13.) She returned to work on May 11, 2004, and reported that she was feeling much better. (Tr. 604.) Her diabetes was under better control, and her depression improved with the use of Paxil. (*Id.*)

On July 2, 2004, Dr. Howard wrote a letter stating that Plaintiff was under his care for diabetes, depression, and recently, chronic alcoholism. (Tr. 303.) He noted that the alcoholism was making it hard to control Plaintiff's diabetes, and significantly added to her inability to work. (*Id.*) About a week later, Plaintiff called Dr. Howard's office and reported her blood sugars were up, she had been crying, and was thinking about going into the hospital. (Tr. 595.)

When Plaintiff saw Dr. Howard for follow-up on July 19, 2004, she reported that she had entered Alcoholics Anonymous, and that she had been abstinent since June. (Tr. 249.) Plaintiff also reported having more trouble with lower back pain. (*Id.*) Dr. Howard ordered an MRI of Plaintiff's lumbar spine. (*Id.*) The MRI indicated broad-based disc bulge at L2-3 through L5-S1 without significant focal

---

[2] The March 2004 medical record is signed with the initials KMH, which later records confirm stands for Dr. Ken M. Howard at Duluth Internal Medicine Associates, St. Luke's. (Tr. 511.)

stenosis or neural compression. (Tr. 695.) The MRI also indicated mild to moderate facet hypertropic changes in the lower lumbar spine. (*Id.*)

In April 2005, four months after her alleged onset-of-disability date, Plaintiff canceled a medical appointment because she was too depressed to get dressed and leave the house. (Tr. 589.) Plaintiff rescheduled her physical examination with Dr. Howard for May 23, 2005, when she reported significant depression rendering her unemployable and barely able to do activities of daily living. (Tr. 493-95.) Plaintiff also reported weight gain, dyspnea[3] on exertion, and back pain if she stood for more than ten minutes. (Tr. 493.) She reported that she drank once a week, and she only smoked while drinking. (*Id.*) Dr. Howard noted Plaintiff had a history of heavier alcohol abuse. (*Id.*)

On physical examination, Plaintiff was obese but in no apparent distress. (Tr. 494.) There were no remarkable findings from her physical examination. (*Id.*) But Dr. Howard diagnosed Plaintiff with chronic depression with worsening symptoms, history of alcoholism with probable binge drinking, diabetes, hypertension, recent weight gain, and chronic back pain. (Tr. 495.) He referred Plaintiff for crisis evaluation of her depression at Miller Dwan Medical Center. (*Id.*)

That same day, May 23, 2005, Plaintiff went to the Behavioral Health Access Center at the Duluth Clinic, and was evaluated by Ann Shirley, a licensed

---

[3]     Dyspnea means difficult or labored breathing. *The Sloane-Dorland Annotated Medical-Legal Dictionary* 234 (West Publishing Co. 1987).

social worker.  (Tr. 911-13.)  Plaintiff reported she had been dismissed from her place of employment for falsifying records, but she was going to court to contest it in hopes of maintaining her unemployment benefits.  (Tr. 911.)  Plaintiff had been at her job for approximately two and a half years, and Ms. Shirley noted Plaintiff's job loss was significant to her.  (*Id.*)  Plaintiff expressed some suicidal ideation and stated she wanted to like her life again.  (*Id.*)  On mental-status examination, Plaintiff reported excessive sleep, weight gain, difficulty with concentration, sadness, and withdrawal from others.  (Tr. 912.)  Her affect was flat, sad, and blunted, and her motor activity was agitated.  (*Id.*)  Ms. Shirley diagnosed Plaintiff with major depressive disorder, recurrent and mild, and assessed a GAF score of 50.[4]  (Id.)  Plaintiff was referred to a partial-hospitalization program, Alcoholics Anonymous, and a grief-support program. (*Id.*)

On May 26, 2005, Plaintiff saw Dr. Joel Zanzow at Orthopaedic Associates of Duluth for triggering in her left ring finger and back pain.  (Tr. 260.) Dr. Zanzow noted that Plaintiff was successfully treated with epidural steroid injections for low back pain seven years earlier.  (*Id.*)  Dr. Zanzow also noted that an MRI from the previous July indicated that Plaintiff had moderate facet arthritis,

---

[4]    The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning."  *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. Text Revision 2000) ("DSM-IV-TR").  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR at 32.

worse on the right at L4-5.  (*Id.*)  Dr. Zanzow recommended an exercise program but noted that if Plaintiff did not get relief, he would schedule an epidural steroid injection.  (*Id.*)  He also gave Plaintiff an injection for trigger finger.[5]  (*Id.*)

On June 7, 2005, Plaintiff was seen by Dr. Timothy Egan at Duluth Clinic after being referred for major depression disorder.  (Tr. 909.)  Despite taking medication for depression, Plaintiff reported a six-month history of depressed mood with poor energy, hypersomnia, poor concentration and memory, increased appetite, and weight gain.  (*Id.*)  Plaintiff attributed her depressed mood to the loss of her job in January.  (*Id.*)  On mental-status examination, Plaintiff was alert, oriented, and depressed, but exhibited a full range of affect, with normal speech and thought processes, intact memory, judgment, and insight.  (Tr. 910.)  Dr. Egan diagnosed major depressive disorder and recommended a trial of Duloxetine.[6]  (*Id.*)

In follow-up with Dr. Zanzow on June 15, 2005, Plaintiff reported that she had a series of epidural steroid injections that did not help her back pain. (Tr. 260.)  She reported that she was unable to walk due to back pain with

---

[5]     Trigger finger is a phenomenon in which the movement of a finger is halted momentarily in flexion or extension and then continues with a jerk.  *Mosby's Dictionary of Medicine, Nursing & Health Professions* 1888 (8th ed. Mosby Elsevier 2009).

[6]     Duloxetine is the generic name for Cymbalta, which is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) indicated for major depressive disorder, generalized anxiety disorder, diabetic peripheral neuropathic pain, and fibromyalgia.  *Physician's Desk Reference* 3430 (59th ed. 2005); *Physician's Desk Reference* 1871-72 (64th ed. 2010).

radiation into her legs. (*Id.*) Plaintiff also requested another injection of her finger. (*Id.*)

On July 8, 2005, Plaintiff asked Dr. Howard to write a letter indicating that she had been treated for depression and diabetes, but she wanted to try to work again. (Tr. 238.) She requested a note from her doctor stating the start and end date of her disability. The record indicates that Plaintiff then requested written excuses from her physician to be off work several times in the next month. (Tr. 234-37.)

Plaintiff saw Dr. Howard again on August 3, 2005, and reported having emotional problems related to her new job, and reported drinking a twelve-pack of beer once a week. (Tr. 235.) Dr. Howard noted Plaintiff's diabetes was under fairly good control, and that Dr. Egan had started her on Cymbalta. (*Id.*) Dr. Howard increased her dosage of Cymbalta and recommended that Plaintiff follow-up with Dr. Egan for her depression. (*Id.*) On August 16, 2005, Plaintiff was terminated from employment for excessive absenteeism. (Tr. 272.)

On August 23, 2005, Plaintiff participated in an adult partial-hospitalization evaluation interview for the Miller-Dwan Medical Center. (Tr. 291-302.) Plaintiff described her mental-health problems beginning after her mother died five years before. (Tr. 291.) She reported that she began to isolate herself, became extremely disorganized, let her house fall into very poor condition, and she felt incapable of doing anything about it. (*Id.*) Plaintiff reported that when she was drinking, she called friends and family while intoxicated. (*Id.*) And she admitted

to drinking until intoxicated once a week. (Tr. 293.) She also reported having poor eating habits and gaining weight. (Tr. 291.) Plaintiff said that her activity level was very poor, for example, she had not cleaned her house in four years. (*Id.*) Based on Plaintiff's interview and the Adult Hospitalization Appropriateness Scale, Plaintiff was found to be a candidate for partial hospitalization. (Tr. 295-96.)

On September 14, 2005, Plaintiff called Dr. Howard and said that she had not been able to start the mental-health program because "she wasn't able to get herself there," but that she intended to start the following Monday. (Tr. 231.) Plaintiff did not see Dr. Howard again until one of her sisters brought her in to see him on January 9, 2006. (Tr. 228.) Dr. Howard noted Plaintiff had been very depressed and was having difficulties getting out of the house. (*Id.*) Plaintiff reported that Cymbalta was not helping her depression. (*Id.*) Dr. Howard scheduled Plaintiff to see psychiatrist Dr. Tomac. (*Id.*)

When Plaintiff saw Dr. Howard ten days later, she reported feeling somewhat better psychiatrically. (Tr. 227.) Her diabetes was also under better control. (*Id.*) However, she had some symptoms suggesting sciatica into the left lower leg, and symptoms suggesting superficial thrombophlebitis on the left calf. (*Id.*) An ultrasound of Plaintiff's leg ruled out deep venous thrombosis. (Tr. 351.) And when Plaintiff saw Dr. Howard on February 22, 2006, he noted that she was doing much better. (Tr. 223.) Specifically, he noted Plaintiff had been abstinent from alcohol for two months, and that she had been going to counseling. (*Id.*)

In March 2006, Plaintiff reported to Dr. Howard during a follow-up visit that she had dyspnea with exertion and some chest discomfort.  (Tr. 222.) Dr. Howard ordered a series of tests and referred Plaintiff to Dr. George Apostolou for a stress test.  (*Id.*; Tr. 273.)  During the stress test, Plaintiff exhibited visible anxiety and experienced fatigue.  (Tr. 273, 340.)  Dr. Apostolou reported that Plaintiff's stress test was "probably negative" with limited exercise tolerance.  (Tr. 273.)  Plaintiff also had a myocardial perfusion scan that indicated a small perfusion defect suggesting a small area of previous infarction, but there were "[n]o convincing wall motion abnormalities" and ejection fraction was 51%. (Tr. 274.)  And an angiography of Plaintiff's chest showed no evidence of pulmonary embolism.  (Tr. 350.)

On May 4, 2006, Dr. David Hanson at St. Luke's Hospital gave Plaintiff an epidural steroid injection to treat her low back pain.  (Tr. 342.)  At the time, Plaintiff reported that her back pain was a dull, low, intermittent pain that was exacerbated by standing and alleviated by sitting.  (*Id.*)  Dr. Hanson noted that an MRI of Plaintiff's lumbar spine showed broad-based disc bulge at L2-3 and L5-S1 and a significant amount of facet hypertrophy.  (*Id.*)  Plaintiff had epidural steroid injections again on May 18, May 25, June 2, and October 19, 2006.  (Tr. 766-73.)

In May 2006, Dr. Howard completed a Medical Opinion form for Plaintiff. (Tr. 270.)  He indicated that Plaintiff was diagnosed with depression and diabetes.  (*Id.*)  When asked to list any permanent physical or mental limitations, Dr. Howard wrote, "difficulty [with] interpersonal relationships in a work setting."

(*Id.*)  He opined that Plaintiff could not be employed in the foreseeable future.  (*Id.*)

Plaintiff saw Dr. Howard again on May 24, 2006.  (Tr. 216.)  Dr. Howard noted that Plaintiff had undergone a few epidural steroid injections, which had helped alleviate her back pain quite a bit.  (*Id.*)  He also noted that Plaintiff was having less trouble with hypoglycemia, but she still had dyspnea on exertion.  (*Id.*)  Dr. Howard opined that the dyspnea was probably related to Plaintiff's increased activity as her depression improved, rather than an underlying intrinsic disease.  (*Id.*)  At that time, he diagnosed Plaintiff with diabetes, depression, obesity, hypertension, and back pain.  (*Id.*)

On June 14, 2006, Psychotherapist Thomas Jensen at Miller-Dwan Medical Center wrote a Discharge Summary regarding Plaintiff's participation in the adult partial-hospitalization program.  (Tr. 257-58.)  First, he noted that Plaintiff had undergone two days of initial screening several months prior to her arrival at the program on May 26, but she did not attend the program because she felt unable to leave her home due to social phobia.  (Tr. 257.)  Mr. Jensen noted that Plaintiff showed up unannounced on May 26 and asked not to be sent home.  (*Id.*)  She attended two days of the program, and reported benefitting from it.  (*Id.*)  Jensen noted that Plaintiff was very verbal, but was somewhat disruptive and needed redirection with her feedback to peers.  (*Id.*)  On June 1st, Plaintiff requested discharge because she felt she would benefit more from individual therapy.  (Tr. 257, 871.)  Plaintiff's diagnoses on discharge were major

depression, recurrent, and anxiety disorder, and Jensen gave Plaintiff a GAF score of 40.  (Tr. 257.)  Her psychiatric medications upon discharge were Cymbalta and Klonopin.  (*Id.*)

On June 20, 2006, Plaintiff had an MRI of her lumbar spine.  (Tr. 693.)  The MRI showed mild narrowing of the neural foramina at L5-S1 due to facet hypertrophic change, with possible slight compression of the left nerve root ganglion.  (*Id.*)  There was no significant disc protrusion or central stenosis.  (*Id.*)  In July 2006, Dr. Zanzow reviewed the MRI of Plaintiff's spine.  (Tr. 362.)  Dr. Zanzow noted the MRI did not show any obvious surgical problems, and he recommended a biking exercise program and physical therapy.  (*Id.*)  Approximately a week later, Plaintiff requested that Dr. Howard give her a prescription for a walker because she could no longer get around due to her back pain. (Tr. 415.)  Dr. Howard prescribed a walker, and thereafter Plaintiff stated that she needed a walker with a seat because her legs get wobbly.  (Tr. 416.)

On August 8, 2006, Dr. Zanzow wrote to Plaintiff about her MRI results. (Tr. 358.)  He stated that the scan showed some changes compatible with arthritis, and that an exercise program and anti-inflammatories would be the most appropriate treatment.  (*Id.*)   In October, Dr. Zanzow referred Plaintiff to the Twin Cities Spine Center, noting that he did not think she was a surgical candidate. (Tr. 359, 361.)  However, he also noted that her back pain was severe and disabling to her, and that she probably would become a candidate for spinal fusion.  (Tr. 359.)

On August 31, 2006, Plaintiff underwent a psychological evaluation with Dr. Robert Hoffman.  (Tr. 387-89.)  Plaintiff reported that she is a high-school graduate with some college, and she worked in a medical office for thirty years. (Tr. 387.)  She also reported recently working for three years at the Metris Company, but that she was fired for missing work due to depression.  (*Id.*) Plaintiff reported to Dr. Hoffman that she had back pain which, when walking or standing, was at a level of ten on a scale of one to ten.  (*Id.*)  Plaintiff stated that epidural steroid injections no longer relieved her back pain, so she was taking Ibuprofen.  (*Id.*)  She also reported that her pain was relieved by sitting or lying down.  (*Id.*)  Plaintiff explained that she had experienced periods of depression for thirteen years; during that time, she had cared for both of her parents and worked full-time until her parents died.  (*Id.*)  Plaintiff described that she was unhappy with no energy or motivation, she had not cleaned her house in two years, and she slept most of the day for a-year- and-a-half.  (*Id.*)[7]  Plaintiff reported that the medications Clonazepam and Cymbalta helped her some and that she was now able to answer the telephone.  (*Id.*)  Plaintiff described suffering anxiety when she prepared to leave her home, and that she avoided panic attacks by staying home.  (*Id.*)  Plaintiff also reported that she had been drinking to intoxication once a week, but that she had been abstinent since the end of December 2005.  (Tr. 388.)

---

[7]     Plaintiff's earnings were significantly lower in the years 2001 and 2002. (Tr. 135-36.)  Presumably this is the time period when she slept most of the day for a year-and-a-half.

On mental-status examination, Dr. Hoffman noted that Plaintiff looked nothing like the person she described. (*Id.*) He noted she was relatively upbeat, energetic, motivated, and outgoing, and that she was well-oriented, followed directions, recalled three objects after ten minutes with no difficulty, and appeared of average intelligence, but had some difficulty concentrating. (*Id.*)

Plaintiff described her daily activities to Dr. Hoffman as follows. She gets up, takes care of her dog, and ordinarily stays in her nightclothes all day. (*Id.*) She eats microwavable food, and does not take care of her house or laundry. (Tr. 388-89.) She calls her sister when she feels good, and meets her aunt once a week. (Tr. 388.) In the last two years, she had gone to a concert, an opera, and three or four movies. (*Id.*) During the day, she watches television or reads. (Tr. 389.)

Dr. Hoffman diagnosed Plaintiff with major depressive disorder, recurrent, mild; and panic disorder with agoraphobia. (*Id.*) He provided Plaintiff with a GAF score of 49. (*Id.*) He opined that (1) Plaintiff had some concentration difficulties but could concentrate on and understand common instructions; (2) she could not carry out tasks with anything resembling reasonable persistence, but her pace for tasks was probably normal; (3) she should respond appropriately to co-workers and supervisors; and (4) she would not tolerate a normal amount of stress in a workplace. (*Id.*)

Plaintiff saw Dr. Howard again on September 29, 2006, and reported that she was having trouble with depression, gaining weight, and her diabetes was

not under control.  (Tr. 421.)  Plaintiff said that three epidural steroid injections had not helped her back pain, and Cymbalta was not adequately helping her depression.  (*Id.*)  Dr. Howard noted Plaintiff was counseling with Jane Martinson at Miller-Dwan Medical Center.  (*Id.*)  He opined that significant weight reduction would probably help Plaintiff's back pain, diabetes, and other problems, but noted that she was unable to follow a diet due to her underlying psychiatric issues.  (*Id.*)

On October 10, 2006, at the request of the Social Security Administration, Dr. R. Owen Nelson completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment Form after reviewing Plaintiff's medical records.  (Tr. 396-413.)  He opined that Plaintiff had an affective disorder and an anxiety-related disorder.  (Tr. 396.)  He further opined that these conditions resulted in mild restrictions of Plaintiff's daily activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, with no episodes of decompensation.  (Tr. 406.)  He specifically opined that Plaintiff had the following abilities:

> Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired for detailed or complex/technical instructions.
>
> Claimant's ability to carry out routine, repetitive and 3-4 step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.

> Claimant's ability to handle co-worker or public contact
> would be reduced but adequate to handle brief and
> superficial contact.
>
> Claimant's ability to tolerate and respond appropriately
> to supervision would be reduced but adequate to handle
> ordinary levels of supervision found in a customary work
> setting.
>
> Claimant's ability to handle stress and pressure in the
> work place would be reduced but adequate to handle
> the stresses of a routine repetitive or a 3-4 step work
> setting. It would not be adequate for the stresses of a
> detailed or complex work setting.

(Tr. 412.)

On October 21, 2006, at the request of the Social Security Administration, Dr. George Salmi completed a Physical Residual Functional Capacity Assessment Form concerning Plaintiff's condition. (Tr. 428-35.) Dr. Salmi opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, never climb ladders, ropes and scaffolds, and only occasionally stoop, crouch, or crawl. (Tr. 429-30.)

On November 7, 2006, Social Worker Jane Martinson from Miller-Dwan Medical Center wrote a letter on Plaintiff's behalf. (Tr. 437.) Ms. Martinson wrote that Plaintiff attended two days of an adult partial-hospitalization program beginning on May 26, 2006, and noted that Plaintiff contacted staff on June 1, 2006, and asked for discharge because she was unable to leave her home. (*Id.*)

Ms. Martinson also noted that Plaintiff maintained contact with her and continued to report depression, anxiety, and social phobia.  (*Id.*)

On November 13, 2006, Plaintiff saw Dr. Timothy Garvey for evaluation of her back pain based on a referral from Drs. Zamzow and Howard.  (Tr. 795.) Plaintiff complained of low back pain with standing and walking but "absolutely no pain with sitting or lying down."  (*Id.*)  She reported that her pain is severe after walking 8-10 minutes but is immediately relieved by sitting down.  (*Id.*)  Plaintiff also reported having three epidural steroid injections with short-term relief, and one injection three weeks ago with excellent relief.  (*Id.*)  The findings from Plaintiff's physical examination were unremarkable.  (Tr. 796.)  Dr. Garvey reviewed an MRI of Plaintiff's lumbar spine that was taken on June 20, 2006, and opined that the MRI showed extensive lipomatosis[8] with resultant stenosis at L5-S1.  (*Id.*)  He also noted disc degeneration and facet arthropathy with resultant neuroforaminal stenosis at L5-S1.  (*Id.*)  Dr. Garvey opined that Plaintiff would benefit from a program of medically managed weight loss or bariatric surgery.  (*Id.*)  He also noted that Plaintiff expressed a strong desire to optimize her medical weight loss, diabetes, and depression so she could resume her activities.  (Tr. 796-97.)

Two days later, Plaintiff saw Dr. Howard.  (Tr. 548.)  Dr. Howard noted that bariatric surgery had been recommended to Plaintiff, but he did not feel Plaintiff

---

[8]  Lipomatosis, a synonym for adiposis, means excessive local or general accumulation of fat in the body.  *Stedman's Medical Dictionary* 28, 1020 (27th ed. 2000.)

was a candidate for surgery due to her "difficulties with compliance," which the Court presumes relates to her diet and diabetes.  (*Id.*)  Plaintiff told Dr. Howard she was feeling somewhat better psychologically since being abstinent from alcohol for one year.  (*Id.*)

On December 11, 2006, Plaintiff saw Psychologist John McBride for an initial assessment.  (Tr. 894-86.)  Plaintiff reported ongoing depression for several years with periods of agoraphobia.  (Tr. 894.)  Plaintiff stated that she spent nearly two years in her home, where she slept much of the time, did not cook or clean, and periodically drank until inebriated.  (*Id.*)  Plaintiff reported that since she quit drinking ten months ago, she was less likely to sleep all day and felt somewhat better.  (*Id.*)  Plaintiff also reported wide mood swings, periods of racing thoughts, and irritability.  (*Id.*)  On mental status examination, Plaintiff was anxious early on but then calmed down.  (Tr. 895.)  She had a tendency to ramble, but her speech was clear and articulate, she was well oriented, her insight was "relatively good," but her judgment was "rather questionable."  (*Id.*)  Mr. McBride diagnosed Plaintiff with major depression, recurrent; and panic disorder with agoraphobia.  (*Id.*)  He also reported Plaintiff with a GAF score of 50.  (Tr. 896.)

When Plaintiff saw Dr. Howard the next week, she reported doing better physically and psychologically.  (Tr. 546.)  Dr. Howard noted that Plaintiff had been taking care of her sister and had not mentioned her back pain.  (*Id.*)  He

also noted that Plaintiff was doing better with a new psychologist, Mr. McBride. (*Id.*)

On January 26, 2007, Plaintiff saw Dr. Howard again and reported doing better, but also reported some chest pain and shortness of breath.  (Tr. 499.) Plaintiff's diabetes and depression were under better control, but Plaintiff reported stress that was probably related to living with one of her sisters who was obsessive about cleaning.  (*Id.*)  There were no remarkable findings upon physical examination and Plaintiff's chest x-rays were normal.  (Tr. 500, 503.)

On February 6, 2007, Plaintiff reported that she was pleased to overcome her agoraphobia and leave the house to see Mr. McBride, and was apologetic for missing her last session.  (Tr. 892-93.)  Plaintiff reported that she had initially moved in with her sister to care for her following an illness, but that she remained living there because she was comfortable there.  (Tr. 893.)  Plaintiff also reported being more depressed in the winter, and that she was continuing to sleep a lot. (*Id.*)  She reported being fearful about cleaning the mess she had made in her own home and leaving her sister's home.  (*Id.*)  Mr. McBride noted that Plaintiff was becoming increasingly frustrated, and that she was often so overwhelmed with emotion that she could not move.  (*Id.*)

Plaintiff saw Mr. McBride again two weeks later, and reported being pleased she could overcome her fears and attend her therapy session.  (Tr. 891-92.)  Plaintiff reported being saddened that her sister who she was presently living with had left for Florida for four months.  (Tr. 892.)  Mr. McBride noted that

with determination, Plaintiff could break free of her fear of leaving her residence. (*Id.*)

On March 8, 2007, Plaintiff returned for her next session with Mr. McBride, and reported turmoil from living with her sister and her niece. (Tr. 891.) Plaintiff realized she might need to return to her own home, and felt ready to focus her attention on cleaning her home. (*Id.*) Plaintiff saw Mr. McBride again two weeks later, and she reported that she had moved out of her sister's home as a result of family turmoil and she was upset by that. (Tr. 890.) However, Plaintiff said she left her sister's home in immaculate condition, and she was interested in returning her home to its original condition. (*Id.*) Plaintiff described being depressed and sleeping more, but Mr. McBride noted that she was much more motivated and somewhat more social and less isolative. (*Id.*)

On March 26, 2007, Plaintiff saw Dr. Howard for follow-up regarding pain that she was experiencing in her right elbow. (Tr. 539.) Dr. Howard diagnosed right lateral epicondylitis, noting he suspected this was from Plaintiff's recent increase in activity as her depression improved. (*Id.*) He recommended rest, Ibuprofen, and ice. (*Id.*) On March 28, 2007, Plaintiff had an electrocardiogram. (Tr. 765.) The results indicated normal sinus rhythm with occasional premature supraventricular complexes. (*Id.*)

On May 5, 2007, Plaintiff underwent a consultative physical examination with Dr. A. Neill Johnson. (Tr. 723-26.) Plaintiff complained of back, neck, shoulder, and right elbow pain, and carpal tunnel syndrome. (Tr. 723.)

Dr. Johnson noted that Plaintiff had back and neck pain since 1996, and had bilateral carpal tunnel release surgery in the 1980s. (*Id.*) He also noted that Plaintiff had been diabetic for 10-11 years. (*Id.*) On physical examination, Plaintiff had normal range of motion in her cervical spine, dorsolumbar spine, shoulders, and elbows. (Tr. 724-25.) Her strength was normal, and she was neurologically intact, although she experienced pain in her right forearm and elbow that resulted in give way. (*Id.*) Plaintiff also had "positive Tinel's sign bilaterally." (Tr. 726.) Dr. Johnson concluded that Plaintiff had diabetes, acute tendinitis at the right elbow, and tenderness at her low back and neck. (*Id.*)

On May 14, 2007, Plaintiff had breast reduction surgery. (Tr. 440-42.) Plaintiff was seen preoperatively by Dr. Howard, who noted that the surgery may partially relieve Plaintiff's back pain. (Tr. 496-98.) After surgery, Dr. Howard noted that Plaintiff lost weight, and her upper back and shoulder pain resolved. (Tr. 526.) In July, Plaintiff suffered an infection related to the surgery, for which she was briefly hospitalized, and then she was evaluated almost daily until she healed at the end of August. (Tr. 448-65, 467-92.)

On June 5, 2007, Plaintiff had a session with Mr. McBride and reported that her brother passed away recently in a fire. (Tr. 889.) Mr. McBride noted that Plaintiff was taking the death as a reason to reevaluate her life, and was feeling better about herself. (*Id.*) Mr. McBride noted that Plaintiff had lost twenty-five pounds after breast reduction surgery, and this had given her a good deal of pain

relief in the neck and back.  (*Id.*)  Mr. McBride noted significant reduction in Plaintiff's depression.  (*Id.*)

In July, Plaintiff told Mr. McBride that her family had been a great help in cleaning and organizing her home after she was hospitalized from complications from her surgery.  (Tr. 888.)  As a result, Plaintiff had regained the energy and desire to maintain her home in a clean and organized way.  (*Id.*)  Mr. McBride noted Plaintiff's incredible progress.  (*Id.*)

However, when Plaintiff saw Mr. McBride on August 14, 2007, she was depressed about putting her dog to sleep.  (Tr. 887.)  On a positive note, Plaintiff reported she had received emotional support from her extended family, and help getting her house to its former condition.  (*Id.*)  However, Plaintiff also reported that she did not feel ready to return to work.  (*Id.*)  At the end of August, Plaintiff reported that she was still grieving the loss of her dog but was trying to stay busy cooking and cleaning.  (Tr. 886.)  Plaintiff also reported that she had been reaching out to others, and reconnecting with old friends.  (*Id.*)  Mr. McBride noted that Plaintiff intended to maintain her new level of energy.  (Tr. 887.)

On September 12, 2007, Plaintiff saw Mr. McBride again.  (Tr. 885.)  She reported being much more social and feeling "the old Peggy ha[d] returned." (Tr. 886.)  Plaintiff was engaging in more activities and had no problem maintaining her home.  (*Id.*)  Plaintiff was surprised that the death of her dog was not more problematic for her.  (*Id.*)  Mr. McBride opined that there were great signs of Plaintiff's progress.  (*Id.*)  Two weeks later, Plaintiff reported feeling

depressed and lonely because of her brother's death.  (Tr. 885.)  Plaintiff realized she needed more activities in her life, and expressed an interest in photography.  (*Id.*)  Mr. McBride noted that Plaintiff was struggling with depression again, although she was more social.  (*Id.*)  Plaintiff stated that she intended to continue to reach out to others, and she was also going to bring a new dog home.  (*Id.*)

 In early September 2007, Plaintiff reported to Dr. Howard that she was doing reasonably well, and her diabetes was under fair control.  (Tr. 520.)  The next month, Plaintiff saw Dr. Howard and reported that her sister was hospitalized and Plaintiff was having increased problems with depression.  (Tr. 518.)  Later in October, Plaintiff reported that she was getting worse; she was crying, sleeping, and not getting out much.  (Tr. 517.)  She also reported severe knee pain.  (*Id.*)  Then, on October 21, 2007, Plaintiff went to the emergency room to be treated for low blood-sugar levels.  (Tr. 742-44.)

On November 8, 2007, Plaintiff visited Mr. McBride and reported struggling with depression since the death of her sister on October 16, 2007.  (Tr. 884.)  As a result of her weight loss and sleep disturbance, Plaintiff was having difficulty controlling her diabetes.  (*Id.*)  However, Plaintiff was happy about getting a new dog.  (*Id.*)  Mr. McBride noted that at the time Plaintiff was struggling with the death of her sister and with ongoing family turmoil.  (*Id.*)  Two weeks later, Plaintiff reported that she was surprised by her more positive attitude as she was grieving her sister's death.  (Tr. 990.)  She explained that she had been

distancing herself from family members who had been negative toward her.  (*Id.*)

Mr. McBride noted Plaintiff had been more physically active and social.  (*Id.*)

On November 13, 2007, Plaintiff saw Dr. Howard and told him that her

sister had died.  (Tr. 511.)  As a result, Plaintiff was having more anxiety and

stress, and low blood-glucose readings.  (*Id.*)  Dr. Howard decided not to change

Plaintiff's medications at that time.  (*Id.*)  Three days later, Dr. Howard wrote a

letter regarding Plaintiff's condition, wherein he stated that Plaintiff's depression

would preclude her from maintaining a full-time job "with minimal absenteeism in

a competitive work environment due to difficulties with interpersonal relationships

and anxiety."  (Tr. 942.)  In early December 2007, Mr. McBride also wrote an

opinion letter on Plaintiff's behalf.  (Tr. 936.)  He opined, based on his treating

relationship with Plaintiff, that he believed she was unable to maintain full-time

work because she struggled with periods of depression, anxiety, and fear of

social situations that would cause her to be absent from work.  (*Id.*)

Plaintiff saw Mr. McBride again on December 5, 2007.  (Tr. 989.)  She was

having a difficult time with Christmas approaching after the deaths of her brother,

sister, and dog.  (*Id.*)  Plaintiff reported, however, that baking gave her joy, and

she was doing so on almost a daily basis.  (*Id.*)  Plaintiff also reported being

somewhat optimistic, but also afraid of the prospect of finding a new apartment.

(*Id.*)

On February 15, 2008, Dr. Howard wrote another letter on Plaintiff's

behalf.  (Tr. 944.)  He opined that Plaintiff could not maintain full-time

employment with minimal absenteeism, mostly due to her psychiatric diagnoses of depression, anxiety, and agoraphobia.  (*Id.*)  He also noted that Plaintiff was recently depressed by the unexpected death of her brother and the death of her sister.  (*Id.*)

Plaintiff saw Mr. McBride at the end of February 2008, after missing a couple of months of therapy.  (Tr. 988.)  Plaintiff reported that she did not have the energy to get up or out of the house, and she spent the past three weeks primarily in bed.  (*Id.*)  Mr. McBride noted that this seemed to have been triggered by the death of her former sister-in-law and that Plaintiff returned to isolation as a method of coping with her sadness.  (*Id.*)

On March 11, Plaintiff reported to Mr. McBride that her physician had increased her Prozac, and that it was helping her improve her attitude and increase her energy level.  (Tr. 987.)  However, Plaintiff was also fearful at the time because her good friend, with whom she had contact every day, would be away for several weeks.  (*Id.*)  Plaintiff also reported continued concerns about the ongoing conflicts in her family.  (*Id.*)

On April 3, 2008, Plaintiff went to the emergency room after two episodes of chest pain.  (Tr. 958.)  Plaintiff was concerned about heart trouble because her sister had died from a sudden cardiac death.  (*Id.*)  Plaintiff reported gaining weight from inactivity but denied other symptoms.  (*Id.*)  Plaintiff also admitted being depressed.  (Tr. 959.)  Plaintiff had a cardiogram, but there was no

significant difference in the findings from a previous cardiogram in March 2007. (*Id.*)

On April 22, 2008, Plaintiff saw Mr. McBride. (Tr. 986.) She expressed concern about her recent trip to Urgent Care, and reported crying for the past several days over the loss of her sister. (Tr. 986.) Plaintiff was isolating herself again, but she was still optimistic about finding a new place to live and leaving the family home. (*Id.*)

In May 2008, Plaintiff was having difficulty with her right hand trigger finger locking on a daily basis. (Tr. 999.) She visited Dr. Zanzow and he gave Plaintiff an injection of Depo-medrol and Lidocaine, which she tolerated well. (*Id.*)

May 28, 2008 was the first anniversary of Plaintiff's brother's death. (Tr. 984.) Plaintiff visited Mr. McBride on that day and reported being deeply sad but also preoccupied with moving to her new apartment. (*Id.*) Plaintiff felt overwhelmed going through her parents' home and packing, but she had some help with that task. (*Id.*) Plaintiff told Mr. McBride she was optimistic about starting a new life. (*Id.*)

On June 25, 2008, Plaintiff went to Urgent Care after feeling a ripping in her left upper arm when carrying a large sack down the steps at her home. (Tr. 961.) She was diagnosed with biceps rupture of the left upper arm with acute strain. (Tr. 962.) An MRI of Plaintiff's left shoulder indicated a complete tear of the biceps tendon, but no rotator cuff tear. (Tr. 967.)

Plaintiff cancelled an appointment with Mr. McBride on July 9, 2008, because she was overwhelmed with emotion, but she rescheduled for the next day. (Tr. 983). Plaintiff reported she and her siblings were having difficulties and were deciding whether to sell the family home and its contents. (*Id.*) However, Plaintiff reported she was quite happy in her new residence, and optimistic about her new life. (*Id.*) Plaintiff saw Mr. McBride again on August 15, 2008. (Tr. 982.) She reported making new friends at her new residence and attending church weekly. (*Id.*) Plaintiff also reported being frustrated in her relationship with her sisters, but that she had given them her portion of the family house to be free from it. (*Id.*)

On August 20, 2008, Plaintiff followed-up with Dr. Howard. (Tr. 973). Dr. Howard noted Plaintiff was doing somewhat better; she was avoiding her family and thus reducing the stress in her life. (*Id.*) The next month, Plaintiff reported to Mr. McBride that she was social with other residents, and maintaining a good mood on almost a daily basis. (Tr. 981.) Plaintiff also reported that she had never attempted to drink or return to her old lifestyle. (*Id.*)

On September 24, 2008, Plaintiff reported to Mr. McBride that she was feeling more comfortable in her new apartment and was having no trouble maintaining it. (Tr. 980.) Plaintiff reported that it was her intention to focus on the positive and not to get caught in the negativity of her siblings. (*Id.*) Plaintiff saw Mr. McBride again on October 22, 2008. (Tr. 979.) She reported that her moods were unpredictable, and she continued to have periods of depression and

severe lack of motivation.  (*Id.*)  Plaintiff reported being more social with people in her building, and avoiding her sister who caused her the most anxiety.  (*Id.*)  Mr. McBride opined that Plaintiff was making good progress in making better choices.  (*Id.*)

On October 23, 2008, Plaintiff saw Dr. Zanzow because her right long finger had been locking every day.  (Tr. 1000.)  Dr. Zanzow gave her an injection and indicated that if the injection did not help, surgery would be indicated for trigger-finger release.  (*Id.*)  Plaintiff had the surgery on November 6, 2008. (Tr. 1001-13.)

On November 10, 2008, Plaintiff saw Mr. McBride again.  (Tr. 1015.)  She reported becoming stronger as she distanced herself from her sisters.  (*Id.*)  She also reported being more social.  (*Id.*)  On November 12, 2008, Mr. McBride wrote a letter indicating that nothing had changed in regard to Plaintiff's ability to work and that "[h]er present situation and disability continues to preclude her from full-time absent free employment."  (Tr. 1018.)

III.    **Testimony at the Administrative Hearing**

**Plaintiff's Testimony**

At the hearing, Plaintiff testified that she was never married, did not have any children, and lived alone.  (Tr. 30.)  She moved in with her mother to care for her in 1993, and lived alone since her mother died in 2000.  (*Id.*)  She has a driver's license and is able to drive, and she has a high-school education and "Vo-Tech" training to be a medical secretary and certified health-unit coordinator.

(Tr. 31.)  Plaintiff explained that she had a history of drinking once a week, and that she smoked when drinking, but never on a daily basis.  (Tr. 32.)  She stated that she quit drinking three years ago and never looked back.  (Tr. 32-33.)

When the ALJ questioned Plaintiff about her functional abilities, she testified that she could walk only a block or two and that she was able to grocery shop with assistance getting her bags to the car.  (Tr. 33.)  She testified that she had a big problem getting motivated to cook or clean, but she did laundry once every two weeks.  (*Id.*)  She explained that taking medication for depression has helped her function a little better.  (Tr. 34.)

On a typical day, Plaintiff explained that she gets up early to take her puppy out, and then she has coffee and watches the news.  (Tr. 35.)  She has had many weeks where she has not even gotten dressed.  (Tr. 36.)  She does not leave the house often, because she has unpredictable panic attacks when leaving the house.  (Tr. 36-37.)  And she explained that she spends a lot of time sleeping.  (Tr. 37.)

Plaintiff testified that the year 2007 was rough because she lost a brother, a sister, and her dog.  (Tr. 39.)  However, she had severe depression even before they died.  (*Id.*)  The ALJ questioned Plaintiff about some notes by her psychologist that indicated Plaintiff was improving.  (Tr. 40.)  Plaintiff testified that medication and counseling had helped her depression, but she had been staying in bed pretty much since the year 2005.  (Tr. 41.)

The ALJ then questioned Plaintiff about her physical condition. (Tr. 41.) Plaintiff testified that her finger was not locking as much after surgery, but it was still painful, as was her left biceps tear. (*Id.*) She also testified that she can lift about five pounds. (Tr. 43.) Plaintiff then explained that she was told her back pain was caused by fat getting between the ligaments and narrowing the spaces where the nerves go. (Tr. 44.) She also testified that she uses insulin twice a day for diabetes, her blood sugars were not consistent, her diabetes caused her to be tired and sleep a lot, and she has neuropathy in both of her feet. (Tr. 45, 47.)

Plaintiff also testified about her work history. She explained that she tried to work doing medical-insurance claims for several weeks in 2005, but was fired for missing too much work. (Tr. 48-49.) Prior to that, she was a collector for three years. (Tr. 50.) She was told that she was fired there for making errors calculating dates, but Plaintiff felt she was fired to rotate her out because she was a higher paid person. (Tr. 50-51.) Before doing collections, she worked in a medical office for 21 years, and ultimately her employment ended after a conflict with a new supervisor. (Tr. 51, 54-55.) Plaintiff also worked for the postal service for three years doing data entry. (Tr. 52-53.) Plaintiff testified that she was afraid to apply for a job in the medical industry because she was afraid of getting fired again, and she did not know if she could go through that again. (Tr. 56.)

Plaintiff testified that Dr. Ken Howard was her physician since at least 1993, and Mr. McBride was her counselor for over a year.  (Tr. 58-59.)  Plaintiff explained that she did not go through with a partial-hospitalization program because she was too anxious to leave her house to attend.  (Tr. 59.)  She has a panic attack once a week, or once every couple of weeks, and after a panic attack, she gets very tired and sleeps for several hours.  (Tr. 62.)  Plaintiff also testified that in a typical week she sees her next door neighbor most days so their puppies can play together.  (Tr. 61.)  In addition, she tries to go to church, which is just across the hall from her apartment.  (Tr. 65.)

**Vocational Expert Testimony**

Edward Eutitus testified at the administrative hearing as a vocational expert.  (Tr. 66.)  The ALJ asked Eutitus a hypothetical question regarding whether a woman with Plaintiff's age, education, and work background, who was limited to light work with no climbing ladders, ropes or scaffolds, no more than occasional stooping, crouching or crawling, no more than frequent use of ramps, stairs, kneeling or balancing, who was limited to routine, repetitive, 3-4 step tasks and instructions, with no more than brief, superficial contacts with others, and who has only routine job stress could perform Plaintiff's past relevant work.  (Tr. 68-69.)   Eutitus testified that he did not think such a person could perform Plaintiff's past relevant work.  (Tr. 69.)

The ALJ then asked Eutitus whether there would be any other type of work such a person could perform under those limitations.  (*Id.*)  Eutitus testified that

such a person could perform the jobs of "collator, operator," "folding machine operator," "inserting machine operator," and other similar occupations of which there were a total of 2,900 positions in the state of Minnesota. (*Id.*) Eutitus also testified that if the person was further excluded from high stress, thus precluding high-production goals, but normal production would still be allowed, he would not change his testimony as to the jobs such a person could perform. (Tr. 70.)

For a third hypothetical question, the ALJ asked Eutitus if his testimony would change if the person also could not lift more than five pounds with the left arm, should not do overhead tasks with the left arm, and should not power grip with her right hand. (*Id.*) Eutitus testified that such a person could still perform the jobs he had described. (*Id.*) The ALJ then added the restriction of inability to walk on uneven or slippery surfaces, and Eutitus testified that the jobs that he referred to are performed inside, so that would not be a factor. (Tr. 71.) Eutitus also testified, however, that if a person would be absent from work once a week, it would preclude employment, and the acceptable absentee rate was no more than two days per month. (*Id.*)

## IV.    **The ALJ's Findings and Decision**

On February 24, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act from January 7, 2005, through the date of the decision, therefore denying Plaintiff's application for disability-insurance benefits. (Tr. 8-21.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows:  (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform."  *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 7, 2005, therefore meeting the requirement at the first step of the disability-determination procedure.  (Tr. 13.) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, depression, anxiety, low back pain, history of trigger fingers with surgical repair, obesity, and left biceps tendon tear.  (*Id.*)  He also found that Plaintiff's alcohol abuse was not a severe impairment because Plaintiff used alcohol only intermittently between her alleged onset date and December 2006, and not at all since December 2006.  (Tr. 15.)

At step three, the ALJ found that neither Plaintiff's physical nor mental impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15.) Specifically, the ALJ concluded that Plaintiff did not meet the "paragraph B" criteria for listings 12.04 or 12.06[9] because Plaintiff's mental impairments did not result in at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation. (Tr. 16.) The ALJ found that Plaintiff's mental impairments resulted in only mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace, and that she had experienced no episodes of decompensation. (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform "light work . . . except she cannot climb ladders, ropes or scaffolds, is limited to occasional stooping, crouching, and crawling, is limited to frequent climbing of ramps and stairs, balancing, and kneeling, cannot lift more than five pounds with her left arm, perform overhead tasks on the left, or perform power gripping on the right, and is limited to low stress jobs which do not have high production goals." (Tr. 17.) In reaching this RFC determination, the ALJ considered Plaintiff's subjective complaints, but found that her "statements concerning the intensity, persistence and limiting effects [of her symptoms] are not credible to the extent

---

[9] Listing 12.04 applies to affective disorders and 12.06 applies to anxiety-related disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1.

they are inconsistent with the above residual functional capacity assessment."
(Tr. 17-18.)

At step four of the disability determination procedure, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 19.) However, at the fifth step of the procedure, the ALJ found that there are machine-operator jobs that exist in significant numbers in the national economy that Plaintiff would be able to perform. (Tr. 19-20.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the

Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges two errors in the ALJ's evaluation of her disability claim. First, she alleges that the ALJ erred in his medical analysis by failing to give due weight to Dr. Howard's, Mr. McBride's, Ms. Martinson's, and Dr. Hoffman's opinions, contending these opinions are supported by Plaintiff's GAF scores, and by the fact that Plaintiff's missed appointments because her mental impairments kept her from leaving her house.[10]  Second, Plaintiff alleges that the ALJ erred in

---

[10]    Plaintiff also made the following incorrect assertions about the ALJ's decision: (1) the ALJ found Plaintiff's only mental limitation was for a low-stress

evaluating her subjective complaints because her excellent work history supports

her allegation of disability.  Plaintiff summarizes the evidence in her favor as

indicating a person with an extensive work history who does not want to miss

work, who then missed a lot of work at the end of her career, who failed a partial

hospitalization because she could not leave her home due to agoraphobia, and

whose GAF scores, physicians' and mental health workers' opinions and

treatment notes support a finding of disability.  This Court will address Plaintiff's

arguments in turn.

### A.    Evaluating the Physicians' Opinions

A treating physician's opinion is typically entitled to controlling weight if it is

"well-supported by medically acceptable clinical and laboratory and diagnostic

techniques" and not inconsistent with other substantial evidence in the record.

*Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*,

---

job with no high-production goal; (2) the ALJ does not mention Dr. Hoffman's
report from the consultative examination or Ms. Martinson's report from Plaintiff's
partial hospitalization; and (3) the ALJ did not consider Plaintiff's GAF scores.

As Defendant points out, the ALJ included additional mental limitations in
the hypothetical question he posed to the vocational expert, including limitations
to routine, repetitive, 3-4 step tasks and instructions, with no more than brief,
superficial contacts with others.  (Tr. 68-69.)  The ALJ relied on the vocational
expert's testimony in response to this hypothetical question in making his
disability determination.  Thus, the ALJ's failure to include these additional
limitations in his written findings is harmless.

Furthermore, although the ALJ did not refer to Dr. Hoffman or
Ms. Martinson by name, he reviewed their treatment records.  (Tr. 14-15.)  The
ALJ also noted Plaintiff's various GAF scores.  (Tr. 14-15.)  The ALJ's analysis of
Plaintiff's GAF scores is addressed below.

201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician."  *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005).  In this case, the record indicates that the ALJ adopted the non-examining consulting psychologist's opinion of Plaintiff's mental residual functional capacity, because the ALJ included those findings in his hypothetical question to the vocational expert, and relied on the vocational expert's opinion in making his disability determination.  (Tr. 412, 68-69.)

Plaintiff argues that the ALJ erred by rejecting Dr. Howard's and Mr. McBride's opinions that Plaintiff's depression and anxiety would cause her to be absent from work excessively because her symptoms waxed and waned. This Court agrees.  The ALJ cited Plaintiff's waxing and waning symptoms of depression as a primary reason for rejecting Dr. Howard's and Mr. McBride's opinions.  (Tr. 18.)  However, this is an inadequate reason to reject the treating physician's and psychologist's opinions because "[t]he SSA's regulations recognize that mental disorders may encompass a level of functioning that 'may vary considerably over time.'  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(2)."  *Newkirk v. Barnhart*, No. C04-3070-MWB, 2005 WL 994578, at *19 (N.D. Iowa Feb. 28, 2005).  In *Newkirk*, for example, the court found that the ALJ erred by

rejecting a physician's opinion based on isolated instances when the claimant's level of functioning improved over the long course of her mental-health treatment. *Id.*

Defendant argues that the record does not support an opinion that Plaintiff would be excessively absent from work due to agoraphobia. In support, Defendant notes that Dr. Howard's and Mr. McBride's treatment notes indicate that Plaintiff's depression improved, she became more social, took her dog out every day, visited a neighbor every day, and only missed one medical appointment after the middle of the year 2007.

The issue, however, is not whether Plaintiff would be excessively absent from work due to agoraphobia, but whether she would be excessively absent from work due to the combination of her impairments. In addition to agoraphobia preventing Plaintiff from leaving her house, Plaintiff's depression caused her to spend long periods of time in bed. Plaintiff reported that she suffered depression for thirteen years, and she spent most of the day in bed for a year and a half after her parents died. (Tr. 387.) And, in February 2008, Plaintiff reported to Mr. McBride that she had recently spent three weeks in bed because she was depressed about the deaths of her sister and her former sister-in-law. (Tr. 988.) Mr. McBride observed that Plaintiff turned to isolation as a method of coping with her sadness. (*Id.*)

A physician's opinion that a claimant would miss work due to the severity of her impairments must be given weight if supported by the record. *See Baker*

*v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998) (finding physician's statement that claimant would miss a great deal of work consistent with pages of medical records detailing claimant's headaches that were treated with injections of Demerol); *see also Robinson v. Astrue*, Civ. No. 08-694 (DSD/JJK), 2009 WL 943856, at *12 (D. Minn. Apr. 6, 2009) (finding physician's opinion on absenteeism consistent with the record). The following evidence supports Dr. Howard's and Mr. McBride's opinions that Plaintiff would be excessively absent from work:

- Even before her alleged onset date of January 7, 2005, Plaintiff missed a lot of work in 2004 from depression. (Tr. 605-14.)

- In April 2005, Plaintiff cancelled a medical appointment because she was too depressed to get dressed and leave her house. (Tr. 589.)

- Although Plaintiff tried to go back to work in July 2005, she missed many days and was terminated for absenteeism in August 2005. (Tr. 234-37, 272.)

- On September 14, 2005, Plaintiff had not started a mental health treatment program because she "wasn't able to get herself there." (Tr. 231.)

- In January 2006, Plaintiff's sister brought Plaintiff to see Dr. Howard because Plaintiff was having difficulties leaving her house and was very depressed. (Tr. 228.)

- Although Plaintiff was supposed to begin a partial hospitalization program several months earlier, she did not start until May 2006, because she was unable to leave her house. (Tr. 257-58, 437.) Plaintiff only attended the program for two days. (*Id.*) She gave different reasons for quitting the program, once stating that she thought individual therapy would be more beneficial, and another time stating she could not attend because she could not leave her house. (Tr. 257, 437.)

- In September 2006, Plaintiff reported "a good deal of trouble with depression." (Tr. 421.)

- After missing an appointment with Mr. McBride in February 2007, Plaintiff overcame her fear to attend a session. (Tr. 892-93.)

- On May 14, 2007, Plaintiff had breast reduction surgery to alleviate her neck and shoulder pain, after which she developed an infection in July and had to attend frequent medical appointments for a month. (Tr. 440-47, 467-92.)

- In February 2008, Plaintiff reported that she missed two months of therapy and that she had spent three weeks in bed because she was depressed over the deaths of her sister and former sister-in-law the previous year. (Tr. 988.)

- In April 2008, Plaintiff reported spending several days crying over the loss of her sister, and she also reported that she was isolating herself again. (Tr. 986.)

As the ALJ noted, Plaintiff began to show some improvement in her mental health in 2007, but unfortunately her progress was set back by the deaths of her brother, sister, and her dog. (*See, e.g.*, Tr. 511, 517, 884-87, 986, 988-89.) These setbacks in her struggle with depression evidence that Plaintiff would have been absent from work in 2007. Therefore, the record supports Dr. Howard's and Mr. McBride's opinions that Plaintiff would have been excessively absent from work from her alleged onset date through April 2008.

However, the evidence shows that Plaintiff improved without significant setbacks after April 2008. Plaintiff no longer missed appointments due to her mental impairments after February 2008, and did not report episodes of crying and isolating herself after April 2008. Plaintiff moved into a new home in the

summer of 2008, and after making the move, she continued to improve and increase her daily activities and social interactions. (*See, e.g.*, Tr. 979-82, 1015.) She no longer had trouble maintaining her home, which had been a serious challenge for her when she was depressed. (Tr. 980.)

This Court concludes that based on the record evidence, the ALJ erred by failing to consider whether Plaintiff was entitled to a closed period of benefits and by rejecting Dr. Howard's and Mr. McBride's opinions due to Plaintiff's subsequent improvement. The Secretary can award disability benefits for a closed period if the record does not support entitlement to continuing benefits. *See Harris v. Sec. of Dept. of Health and Human Svcs.*, 959 F.2d 723, 724 (8th Cir. 1992) (citing 20 C.F.R. § 404.316, and stating that "disability is not an 'all-or-nothing' proposition; a claimant who is not entitled to continuing benefits may well be eligible to receive benefits for a specific period of time"). The vocational expert testified that absences of two days a month would preclude competitive employment. (Tr. 71.) There is not substantial evidence in the record as a whole showing that Plaintiff's impairments would not have caused her to miss more than 24 days of work each year during the period of January 7, 2005, through April 2008. As explained above, the evidence in the record shows otherwise. Furthermore, Plaintiff's GAF-score history supports a finding of disability for a closed period. GAF scores between 41-50 indicate serious impairment in functioning. *See supra* note 3. On May 23, 2005, Ann Shirley, a licensed social worker, assessed Plaintiff with a GAF score of 50 and recommended treatment in

a partial-hospitalization program. (Tr. 912.) After Plaintiff attended the partial-hospitalization program for two days in May 2006, Psychotherapist Thomas Jensen assessed her with a GAF score of 40. (Tr. 257.) Dr. Hoffman, the psychologist who evaluated Plaintiff at the request of the Social Security Administration, assessed Plaintiff with a GAF score of 49 in August 31, 2006. (Tr. 389.) And in December 2006, Psychologist John McBride assessed Plaintiff with a GAF score of 50. (Tr. 896.) This is the final GAF score in the record. Plaintiff's GAF scores between 40 and 50 by four different mental-health evaluators over a period of more than a year-and-a-half support Dr. Howard's and McBride's opinions of the severity of Plaintiff's limitations, at least for the closed period of disability discussed above. *See Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir. 2009) (finding total GAF-score history supported physician's opinion.) Thus, the overwhelming evidence in the record as a whole supports that Plaintiff was entitled to a closed period of disability for the period of January 7, 2005 through April 30, 2008, the last month in which Plaintiff reported significant episodes of depression and isolating herself.

Therefore, the Court finds that the case should be remanded for calculation and award of benefits for a closed period of disability. *See Bowers v. Astrue*, No. C 06-3089-MWB, 2008 WL 216607, at *7 (N.D. Iowa Jan. 24, 2008) (awarding benefits for closed period based on evidence of anxiety, low GAF scores, and the vocational expert's testimony that missing work three or more days a month precludes competitive employment).

**B. Evaluating Credibility**

Plaintiff also contends that her extensive work history prior to her alleged onset date supports her subjective complaints. In evaluating the credibility of a claimant's subjective complaints, the ALJ must consider evidence such as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole. *Id.* But the ALJ must detail his reasons for discrediting the testimony. *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). A solid work record enhances a claimant's credibility. *Harris*, 959 F.2d at 726.

Plaintiff has an excellent work history from 1978 through 2005, with only a two-year-period of lower earnings in 2001 and 2002. (Tr. 135-36.) The ALJ noted that Plaintiff's work history was a positive credibility factor, but does not appear to have given it much weight. (Tr. 18.) Instead, the ALJ discounted Plaintiff's credibility based on isolated periods of improvement in her mental health, especially after she moved into a new apartment in 2008, and because of her ability to do such things as grocery shop and manage her own finances. (*Id.*)

The record reflects that Plaintiff suffered from depression for thirteen years. (Tr. 387.) Plaintiff reported that she spent most of her day in bed for a year-and-a-half after her mother died in 2000, which is supported by evidence of

Plaintiff's lower earnings in 2001 and 2002. (Tr. 136-37, 387.) Although Plaintiff experienced a period of time where she had many employers, this was after she had worked for the same employer for two decades. (Tr. 159-68.) And Plaintiff continued to work despite repeated job transitions, suggesting she was motivated to continue working until her condition prevented her from doing so. (Tr. 48-58, 159-68.)

Plaintiff attributed the decline in her mental health in 2005, to the loss of her job (Tr. 909), and social worker Ann Shirley, who evaluated Plaintiff for partial hospitalization, noted Plaintiff's job loss was significant to her. (Tr. 911.) Dr. Hoffman, the consultative psychological evaluator, also opined that Plaintiff could not handle normal job stress. (Tr. 389.) This evidence and Plaintiff's work history supports Plaintiff's subjective complaints of severe depression and anxiety causing her to isolate herself in her home after she lost her job in 2005.

Although the Court agrees with the ALJ's finding that there is evidence in Dr. Howard's and Mr. McBride's treatment notes that Plaintiff's mental health began improving in 2007 (Tr. 539, 885-90), as described above, Plaintiff suffered significant setbacks in 2007, after the death of her brother, sister, former sister-in-law, and dog, that would have caused her to miss significant amounts of work through April 2008, in addition to work she would have missed from surgery and a subsequent infection. While the evidence of Plaintiff's improvement would support a decision that Plaintiff was not entitled to continuing disability benefits, it does not support the ALJ's finding that Plaintiff's subjective complaints were

never credible.  The evidence as a whole indicates a person who worked for almost thirty years, suffered depression for thirteen years, but whose mental health further declined after experiencing the stress of losing a job in 2005, and the stress and sadness from turmoil and deaths in her family in 2007, causing her to suffer a period of disabling depression and anxiety.  Accordingly, Plaintiff's subjective complaints are consistent with the evidence as a whole for the closed period of January 7, 2005, through April 30, 2008.  Fortunately, Plaintiff was able to improve with medication, therapy, and by moving into a new home.  But because the ALJ never considered the evidence as a whole, his credibility analysis was flawed.  Thus, as further discussed above, the Court finds that overwhelming evidence in the record supports a closed period of disability.

### RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 6), be **GRANTED IN PART** for award of a closed period of disability and **DENIED IN PART** for award of continuing disability benefits;

2.     Defendant's Motion for Summary Judgment (Doc. No. 10), be **DENIED**;

3.     The case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of disability-insurance benefits for a closed period of January 7, 2005, through April 30, 2008.

Date: May 3, 2010                    ___*s/ Jeffrey J. Keyes*_____

                                    JEFFREY J. KEYES
                                    United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**May 17, 2010**, a writing which specifically identifies those portions of this Report
to which objections are made and the basis of those objections.  Failure to
comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within fourteen days after service thereof.  A judge shall
make a de novo determination of those portions to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable to the Court of Appeals.